GENERAL COMMITTEE OF ADJUSTMENT OF THE BROTHERHOOD OF LOCOMOTIVE ENGINEERS FOR THE MISSOURI-KANSAS-TEXAS RAILROAD *v.* MISSOURI-KANSAS-TEXAS RAILROAD CO. ET AL.

No. 23. Argued October 14, 1943.—Decided November 22, 1943.

324

*Messrs. John W. Madden, Jr.* and *Harold N. McLaughlin,* with whom *Mr. Clarence E. Weisell* was on the brief, for petitioner.

*Mr. Lucian Touchstone,* with whom *Messrs. Allen Wight* and *C. S. Burg* were on the brief, for the Missouri-Kansas-Texas Railroad Co., et al.; and *Mr. Harold C. Heiss,* with whom *Messrs. Russell B. Day* and *T. D. Gresham* were on the brief, for the General Grievance Committee of the Brotherhood of Locomotive Firemen and Enginemen,—respondents.

*Solicitor General Fahy* and *Mr. Robert L. Stern* filed a brief on behalf of the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case involves a dispute under the Railway Labor Act concerning the authority of two railroad Brotherhoods to represent certain employees in collective bargaining with the defendant-carriers. The petitioner (hereinafter called the Engineers) is a committee of the Brotherhood of Locomotive Engineers which has been and is the duly designated bargaining representative for the craft of engineers employed by the carriers. The third-party defendant (hereinafter called the Firemen) is a committee of the Brotherhood of Locomotive Firemen and Enginemen which has been and is the duly designated bargaining representative for the craft of firemen on the same lines. Each craft has long had an agreement with the carriers concerning rules, rates of pay, and working conditions. The agreement with the Engineers states that the right to make and interpret contracts, rules, rates and working agreements for locomotive engineers is vested in that committee. The agreement with the Firemen contains a similar provision concerning members of that craft. Both agreements also contain rules governing the demotion of engineers to be firemen, the promotion of firemen to be engineers, and return of demoted engineers to their former work.[1] For many years the two Brotherhoods had an

---

[1] Generally speaking, employees hired under collective bargaining agreements as firemen immediately begin to acquire seniority as such. After a certain period firemen are required to take an engineer's examination. Vacant positions as engineers are filled from the list of those who have passed the qualifying tests. When it is necessary to reduce the force of working engineers those with the lowest seniority are dropped and they resume their positions as firemen in accordance with the seniority in that craft. As a result, firemen with a lower seniority are moved down the ladder of jobs. Thus the most junior firemen are deprived of work and furloughed until their services are needed. When a vacancy occurs in the engineers' ranks or when the work of engineers increases, all move up the ladder of jobs again.

agreement which established rules and regulations on these subjects and which provided machinery for resolving disputes which might arise between them. This agreement was cancelled in 1927. The present dispute arose since that time and relates to the calling of engineers for emergency service. In general the Engineers and the carriers had a working arrangement providing (1) that, excepting Smithville, Texas, the senior available demoted engineer whose home terminal was at the place where the service was required or the man assigned to the particular run as fireman, if he had greater seniority as engineer, would be chosen when it was necessary to call an engineer for emergency service; (2) that the regulation of the engineers' working lists was to be handled by the Engineers' local chairman, not by the management; and (3) that at Smithville, emergency work would be performed by advancing the assignment of engineers in the so-called "pool," [2] instead of calling in emergency engineers. These arrangements were not satisfactory to the Firemen. After protest to the carriers and after a failure of the Brotherhoods to resolve their dispute the matter was submitted to the National Mediation Board for mediation. The Engineers did not participate. The Firemen and the carriers entered into the Mediation Agreement of December 12, 1940, the validity of which is here challenged. The effect of that agreement was in general to eliminate the preference previously given to engineers of the home terminal and the special arrangement at Smithville in favor of the pool engineers. It also changed the practice respecting the handling of the engineers' working lists—

[2] Engineers are generally assigned in order of seniority to regular runs (both passenger and freight), then to pool freight service (which rotates irregular runs among the pool members on a first in first out basis), and then to extra boards of engineers from which assignments are made as positions are available. If no engineer in those categories is available, the senior available qualified engineer working as a fireman is called as an "emergency" engineer.

thereafter the assignments would be handled by the management assisted by the local chairmen of the two groups. After making the agreement the carriers gave notice to the Engineers that they were cancelling previous arrangements with that Brotherhood.

The Engineers then brought this action for a declaratory judgment (48 Stat. 955, 28 U. S. C. § 400) that the agreement of December 12, 1940, was in violation of the Railway Labor Act (44 Stat. 577, 48 Stat. 1185, 45 U. S. C. § 151) and that the Engineers should be declared to be the sole representative of the locomotive engineers with the exclusive right to bargain for them. The carriers in their answer prayed that the court declare the respective rights of the parties. And the Firemen, though challenging the jurisdiction of the court, in the alternative asked that the agreement of December 12, 1940, be declared valid. The District Court dismissed the petition, holding that the carriers had a right to contract with either of the crafts with reference to the problems in question. The Circuit Court of Appeals held that both crafts were interested in the subject matter of the dispute, that neither craft had an exclusive right to bargain concerning the matters in issue, that the representatives of both crafts should confer and if possible agree, and that the agreement of December 12, 1940, might be terminated by the carriers if not acquiesced in by the Engineers. 132 F. 2d 91.

The case is here on a petition for certiorari which we granted because of the importance of the problems raised by the assumption of jurisdiction over such controversies by the federal courts.

The bulk of the argument here relates to the merits of the dispute. But we do not intimate an opinion concerning them. For we are of the view that the District Court was without power to resolve the controversy.

It is our view that the issues tendered by the present litigation are not justiciable—that is to say that Congress

by this Act has foreclosed resort to the courts for enforcement of the claims asserted by the parties.

The history of this legislation has been traced in earlier cases coming before this Court. See *Pennsylvania R. Co.* v. *Railroad Labor Board*, 261 U. S. 72; *Pennsylvania System Federation* v. *Pennsylvania R. Co.*, 267 U. S. 203; *Texas & New Orleans R. Co.* v. *Brotherhood of Clerks*, 281 U. S. 548; *Virginian Ry. Co.* v. *System Federation No. 40*, 300 U. S. 515. The present Act is the product of some fifty years of evolution.[3] For many years the

---

[3] The first of seven statutes enacted during this period was the Arbitration Act of 1888, 25 Stat. 501. This act provided for the voluntary arbitration of disputes and authorized the President to set up investigating committees. It was superseded in 1898 by the Erdman Act (30 Stat. 424) which provided machinery for arbitration and also introduced for the first time the policy of mediation. The mediators were the chairman of the Interstate Commerce Commission and the United States Commissioner of Labor. Next came the Newlands Act of 1913 (38 Stat. 103) which established a permanent Board of Mediation and Conciliation. Under both the Erdman and Newlands acts, mediation was to be employed first, and upon failure of that the mediators were to attempt to have the parties arbitrate. In 1916 Congress passed the Adamson Act (39 Stat. 721) in settlement of a dispute over the eight-hour day. That act provided for an eight-hour day for train operators and a commission to enforce it. Upon return of the railroads to private ownership, the Esch-Cummins law was passed. See Title III of the Transportation Act of 1920, 41 Stat. 456. This act differed from the earlier legislation by providing for public representation on a newly created Railroad Labor Board, by permitting the Board to investigate all disputes of its own initiative, and by placing the primary burden of settlement of disputes on direct negotiations between the parties. In 1926 Congress passed the first Railway Labor Act (44 Stat. 577) which was amended in 1934, 48 Stat. 1185. See Alderman, The History of Federal Legislation Dealing with Machinery for Settling Disputes Concerning Wages and Working Conditions of Employees of Interstate Railroads (1938); The Railway Labor Act and the National Mediation Board (1940), pp. 7–8, 67–76; Fisher, Industrial Disputes (1940), pp. 154–86; Johnson, Government Regulation of Transportation (1938), pp. 190–206; Parmelee, The Modern Railway (1940), pp. 420–35; Spencer, The

only sanctions under the various Congressional enactments in this field were publicity and public opinion. A conspicuous example concerns the Railroad Labor Board, constituted under the Transportation Act of 1920. It had important functions to perform. But this Court held in the *Federation No. 90* case (267 U. S. 203) that the Board's decisions were not supported by any legal sanctions. The parties to the labor controversies covered by the Act were not "in any way to be forced into compliance with the statute or with the judgments pronounced by the Labor Board, except through the effect of adverse public opinion." *Id.*, p. 216. The 1926 Act (44 Stat. 577) made a basic change in the pattern of the railway labor legislation which had preceded.[4] Conciliatory means were adhered to; provisions for mediation and arbitration were adopted; and the use of that machinery on a voluntary basis was encouraged.[5] But Congress also supported its policy with the imposition of some rules of conduct for breach of which the courts afford a sanction. Thus Congress stated in § 2, Third of the 1926 Act that the choice by employees of their collective bargaining representatives should be free from the carriers' coercion and influence. That "definite statutory prohibition of conduct which would thwart the declared purpose" of the Act was held by this Court in the *Clerks* case to be enforcible in an appropriate suit. 281 U. S. 548, 568. As stated by Chief Justice Hughes in that case:

"Freedom of choice in the selection of representatives on each side of the dispute is the essential foundation of

National Railroad Adjustment Board (1938), pp. 1–16; Witte, The Government in Labor Disputes (1932), pp. 238–44; Wolf, The Railroad Labor Board (1927), pp. 1–13; Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L. J. 567.

[4] The Railway Labor Act and the National Mediation Board (1940), pp. 1–8.

[5] S. Rep. No. 222, 69th Cong., 1st Sess., p. 4.

the statutory scheme. All the proceedings looking to amicable adjustments and to agreements for arbitration of disputes, the entire policy of the Act, must depend for success on the uncoerced action of each party through its own representatives to the end that agreements satisfactory to both may be reached and the peace essential to the uninterrupted service of the instrumentalities of interstate commerce may be maintained. There is no impairment of the voluntary character of arrangements for the adjustment of disputes in the imposition of a legal obligation not to interfere with the free choice of those who are to make such adjustments. On the contrary, it is of the essence of a voluntary scheme, if it is to accomplish its purpose, that this liberty should be safeguarded. The definite prohibition which Congress inserted in the Act can not therefore be overridden in the view that Congress intended it to be ignored. As the prohibition was appropriate to the aim of Congress, and is capable of enforcement, the conclusion must be that enforcement was contemplated." 281 U. S. p. 569.

Thus what had long been a "right" of employees enforcible only by strikes and other methods of industrial warfare emerged as a "right" enforcible by judicial decree. The right of collective bargaining was no longer dependent on economic power alone.

Further protection was accorded that right by the amendments which were added in 1934. Thus § 2, Ninth provided machinery strengthening the representation provisions of the Act. H. Rep. No. 1944, 73d Cong., 2d Sess., p. 2. That new provision gave the National Mediation Board an adjudicatory function in the settlement of representation disputes. It provided for a reference to that Board of representation disputes arising among a carrier's employees. It charged the Board with the "duty" upon the request of either party to the dispute to investigate the controversy and to certify the name or names

of the designated and authorized representatives of the employees. And Congress added the command that "Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act." It was that specific command for disobedience of which this Court held in the *Virginian Ry. Co.* case (300 U. S. 515) that courts would provide a remedy. That result was reached over the objection that § 2, Ninth stated a policy but created no rights or duties enforcible by judicial decree. This Court reviewed the history of § 2, Ninth—its purpose and meaning. It concluded that the provision in question was "mandatory in form and capable of enforcement by judicial process." *Id.,* p. 545. It observed that if the provision were construed as being precatory only, its addition to the Act was "purposeless"; that only a requirement of "some affirmative act on the part of the employer" would add to the 1926 Act. *Id.,* p. 547. The Court accordingly concluded that the command of § 2, Ninth could not have been intended to be without legal sanction.

Other similar statutory commands or prohibitions were provided by Congress. The right of the majority of a craft or class to determine who shall be the craft or class representative (§ 2, Fourth); the right of the employees to designate as their representative one who is not an employee of the carrier (§ 2, Third); the prohibition against "yellow dog" contracts (§ 2, Fifth) are illustrative.[6] Moreover, administrative machinery was provided for the adjudication of certain controversies. Congress established the National Railroad Adjustment Board for the settlement of specific types of disputes or grievances between employees and the carrier. § 3. And Congress gave the courts jurisdiction to entertain suits based on the awards of the Adjustment Board. § 3, First (p). That

[6] Criminal penalties were added by § 2, Tenth for the wilful violation of certain provisions of the Act including the three just mentioned.

feature of the Act, as well as § 2, Ninth which placed on the Mediation Board definite adjudicatory functions, transferred certain segments of railway labor problems from the realm of conciliation and mediation to tribunals of the law. The new administrative machinery plus the statutory commands and prohibitions marked a great advance in supplementing negotiation and self-help with specific legal sanctions in enforcement of the Congressional policy.

But it is apparent on the face of the Act that while Congress dealt with this subject comprehensively, it left the solution of only some of those problems to the courts or to administrative agencies. It entrusted large segments of this field to the voluntary processes of conciliation, mediation, and arbitration. Thus by § 5, First, Congress provided that either party to a dispute might invoke the services of the Mediation Board in a "dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference" and any other "dispute not referable" to the Adjustment Board and "not adjusted in conference between the parties or where conferences are refused." [7] Beyond the mediation machinery furnished by the Board lies arbitration. § 5, First and Third, § 7. In case both fail there is the Emergency Board which may be established by the President under § 10. In short, Congress by this legislation has freely employed the traditional instruments of mediation, conciliation and arbitration. Those instruments, in addition to the available economic weapons, remain unchanged in large areas of this railway labor field. On only certain phases of this controversial subject has Congress utilized

---

[7] The Mediation Board also has power of interpretation of mediation agreements. § 5, Second. It likewise has duties with respect to the arbitration of disputes. See § 5, Third. Mediation is the Board's "most important task." Eighth Annual Report, National Mediation Board (1942) p. 4.

administrative or judicial machinery and invoked the compulsions of the law. Congress was dealing with a subject highly charged with emotion. Its approach has not only been slow; it has been piecemeal. Congress has been highly selective in its use of legal machinery. The delicacy of these problems has made it hesitant to go too fast or too far. The inference is strong that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate.

That history has a special claim here. It must be kept in mind in analyzing a bill of complaint which, like the present one, seeks to state a cause of action under the Railway Labor Act and asks that judicial power be exerted in enforcement of an obligation which it is claimed Congress has created.

The Engineers assert that the carriers had no right under the Act to negotiate with the Firemen on the subject of emergency engineers and that the Mediation Agreement of December 12, 1940, is therefore void. They rely on § 2, Fourth of the Act and on § 2, First and Ninth.[8] Sec. 2, Fourth states that "Employees shall have the right to organize and bargain collectively through representatives of their own choosing." But that great right, which Congress in 1926 at last supported with legal sanctions, is not challenged here. The Engineers and the Firemen are the collective bargaining agents for their respective crafts and are acknowledged as such. Their authority so to act is not

---

[8] Respondents in support of their prayers for declaratory relief rely not only on the implications from these and other sections of the Act but also on the proviso clause of § 1, Fifth to the effect "That no occupational classification made by order of the Interstate Commerce Commission shall be construed to define the crafts according to which railway employees may be organized by their voluntary action, nor shall the jurisdiction or powers of such employee organizations be regarded as in any way limited or defined by the provisions of this Act or by the orders of the Commission."

challenged. Nor is it apparent how the majority rule provision of § 2, Fourth is involved here. It states that "The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this Act." But concededly the Engineers represent a majority of the craft of engineers and the Firemen a majority of the firemen's craft. The principle of majority representation is not challenged. Nor does § 2, Second make justiciable what otherwise is not. It provides that "All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute." As we have already pointed out, § 2, Ninth, after providing for a certification by the Mediation Board of the particular craft or class representative, states that "the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this Act." That command of § 2, Ninth was enforced in the *Virginian Ry. Co.* case. But § 2, Second, like § 2, First,[9] merely states the policy which those other provisions buttress with more particularized commands.

It is true that the present controversy grows out of an application of the principles of collective bargaining and majority rule. It involves a jurisdictional dispute—an asserted overlapping of the interests of two crafts. It necessitates a determination of the point where the au-

---

[9] Sec. 2, First provides: "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

thority of one craft ends and the other begins or of the zones where they have joint authority. In the *Clerks* case and in the *Virginian Ry. Co.* case the Court was asked to enforce statutory commands which were explicit and unequivocal. But the situation here is different. Congress did not attempt to make any codification of rules governing these jurisdictional controversies. It did not undertake a statement of the various principles of agency which were to govern the solution of disputes arising from an overlapping of the interests of two or more crafts. It established the general principles of collective bargaining and applied a command or prohibition enforcible by judicial decree to only some of its phases. The contention, however, is that the rule which Congress intended to govern can be found from the implications of the Act. Thus it is argued that the reasons which support the holding in the *Virginian Ry. Co.* case that the right of majority craft representation is exclusive also suggest that Congress intended to write into the Railway Labor Act a restriction on the rules and working conditions concerning which the craft has the right to contract. It is pointed out that if the jurisdiction of a craft within which the exclusive right may be exercised is not limited, then disputes between unions may defeat the express purposes of the Act. In that connection reference is made to the statement of this Court in the *Virginian Ry. Co.* case (300 U. S. p. 548) that the Act imposes upon the carrier "the affirmative duty to treat only with the true representative, and hence the negative duty to treat with no other." That expresses the basic philosophy of § 2, Ninth. But the decision does not imply, as is argued here, that every representation problem arising under the Act presents a justiciable controversy. It does not suggest that the respective domains for two or more overlapping crafts should be litigated in the federal district courts.

It seems to us plain that when Congress came to the question of these jurisdictional disputes, it chose not to leave their solution to the courts. As we have already pointed out, Congress left the present problems far back in the penumbra of those few principles which it codified. Moreover, it selected different machinery for their solution. Congress did not leave the problem of inter-union disputes untouched. It is clear from the legislative history of § 2, Ninth that it was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a wide range of jurisdictional disputes between unions or between groups of employees.[10] H. Rep. No. 1944, *supra*, p. 2; S. Rep. No. 1065, 73d Cong., 2d Sess., p. 3. However wide may be the range of jurisdictional disputes embraced within § 2, Ninth,[11] Congress did not select the courts to resolve them. To the contrary, it fashioned an administrative remedy and left that group of disputes to the National Mediation Board. If the present dispute falls within § 2, Ninth, the administrative remedy is exclusive.[12] If a narrower view of § 2, Ninth is taken, it is difficult to believe that Congress

[10] This is made clear by Commissioner Eastman, the draftsman of the 1934 amendments, in his testimony at the hearings. See Hearings, Committee on Interstate and Foreign Commerce, House of Representatives, 73d Cong., 2d Sess., on H. R. 7650, pp. 39–41, 45, 57–58, 59.

[11] It is apparently the view of the National Mediation Board that § 2, Ninth was designed to cover only those disputes entailing an election by employees of their representatives. See *Brotherhood of Railroad Trainmen* v. *National Mediation Board,* 135 F. 2d 780, 782. In an election case the Board may have to make a preliminary determination as to the eligibility of voters involving the type of problem presented here. See *Brotherhood of Railroad Trainmen* v. *National Mediation Board,* 88 F. 2d 757, dealing with the question whether brakemen having seniority as conductors could vote in the conductors' election.

[12] Whether judicial power may ever be exerted to require the Mediation Board to exercise the "duty" imposed upon it under § 2, Ninth and, if so, the type or types of situations in which it may be invoked present questions not involved here.

saved some jurisdictional disputes for the Mediation Board and sent the parties into the federal courts to resolve the others. Rather the conclusion is irresistible that Congress carved out of the field of conciliation, mediation and arbitration only the select list of problems which it was ready to place in the adjudicatory channel. All else it left to those voluntary processes whose use Congress had long encouraged to protect these arteries of interstate commerce from industrial strife. The concept of mediation is the antithesis of justiciability.

In view of the pattern of this legislation and its history the command of the Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforcible in the courts should be implied. Unless that test is met the assumption must be that Congress fashioned a remedy available only in other tribunals. There may be as a result many areas in this field where neither the administrative nor the judicial function can be utilized. But that is only to be expected where Congress still places such great reliance on the voluntary process of conciliation, mediation and arbitration. See H. Rep. No. 1944, 73d Cong., 2d Sess., p. 2. Courts should not rush in where Congress has not chosen to tread.

We are here concerned solely with legal rights under this federal Act which are enforcible by courts. For unless such a right is found it is apparent that this is not a suit or proceeding "arising under any law regulating commerce" over which the District Court had original jurisdiction by reason of § 24 (8) of the Judicial Code, 28 U. S. C. § 41 (8). Cf. *Puerto Rico* v. *Russell & Co.*, 288 U. S. 476, 483; *Gully* v. *First National Bank*, 299 U. S. 109; *Peyton* v. *Railway Express Agency*, 316 U. S. 350, 352. When a court has jurisdiction it has of course "authority to decide the case either way." *The Fair* v. *Kohler Die Co.*, 228 U. S. 22, 25. But in this case no declaratory decree should have been entered for the benefit of any of

the parties. Any decision on the merits would involve the granting of judicial remedies which Congress chose not to confer.

*Reversed.*

MR. JUSTICE JACKSON concurs in the result.

MR. JUSTICE ROBERTS and MR. JUSTICE REED are of the view that the Court should entertain jurisdiction of the present controversy for the reasons set out in the dissent in *Switchmen's Union* v. *National Mediation Board, ante,* p. 307.

