**R. RICHARDSON et al., Plaintiffs,**

**v.**

**TEXAS AND NEW ORLEANS RAIL-ROAD COMPANY et al.,**
**Defendants.**

**Civ. A. No. 9240.**

United States District Court
S. D. Texas, Houston Division.

March 28, 1956.

Roberson L. King, Houston, Tex., Joseph C. Waddy, William C. Gardner, and William B. Bryant, Washington, D. C., for plaintiffs.

Baker, Botts, Andrews & Shepherd, Hugh M. Patterson and Robert L. Steely, Houston, Tex., for Defendant Texas and New Orleans Railroad Company.

Jacobs & Schmidt, George L. Schmidt, Houston, Tex., Willis & Willis, J. Hart Willis, Dallas, Tex., and Wayland K. Sullivan, Cleveland, Ohio, for defendants Brotherhood of Railroad Trainmen and others.

INGRAHAM, District Judge.

This is a suit filed by four plaintiffs who allege that they are Negroes employed as yardmen by the defendant Railroad, suing for themselves and all other Negro yardmen as a class, against Texas and New Orleans Railroad Company, hereinafter referred to as T&NO, and Brotherhood of Railroad Trainmen, an unincorporated association, Bayou City Lodge, No. 145, Brotherhood of Railroad Trainmen, an unincorporated association, L. Bradley, President, Bayou City Lodge, No. 145, Brotherhood of Railroad Trainmen, an unincorporated association, G. M. Leach Lodge, No. 228, Brotherhood of Railroad Trainmen, an unincorporated association, J. N. Hatler, President, G. M. Leach Lodge, No. 228, Brotherhood of Railroad Trainmen, an unincorporated association, Houston Lodge, No. 697, Brotherhood of Railroad Trainmen, an unincorporated association, Elmer Moore, President, Houston Lodge, No. 697, Brotherhood of Railroad Trainmen, an unincorporated association, and W. T. Meredith, Chairman, General Grievance Committee, Brotherhood of Railroad Trainmen, an unincorporated association, hereinafter collectively referred to as BofRT.

Plaintiffs sue "to obtain redress for violation of rights vouchsafed to them by the Railway Labor Act [45 U.S.C.A. § 151 et seq.]," joining T&NO with BofRT and certain lodges and officers of

that organization as co-defendants. The complaint alleges (a) that plaintiffs are Negro yardmen employees of T&NO who are represented for collective bargaining purposes by the BofRT; (b) that the BofRT has discriminated against plaintiffs in its representation of them, solely on account of color, and that plaintiffs were originally employees of H&TC and HE&WT Railroads, whose operations were consolidated with those of T&NO many years ago, since which time plaintiffs have been designated as "H&TC Protected Men" while yardmen employees of other companies in the merger were designated as "T&NO Protected Men", the former group being all Negroes and the latter all white; (c) that during all the time since the merger "many years ago" an arrangement or practice existed whereby H&TC Protected Men acted as engine foremen of crews consisting of H&TC Protected Men only, but whenever a T&NO Protected Man was moved in on an H&TC Protected Man crew to fill a temporary vacancy, the T&NO man acted as foreman, even though of less seniority and no more qualification than the H&TC men; (d) that on September 25, 1952, the BofRT entered into a "collective bargaining agreement" with T&NO providing that such long standing past practice would be continued; and (e) that this practice, as "perpetuated" in the 1952 agreement is discriminatory and void, and the BofRT has not represented the plaintiffs as required by law. The prayer in the complaint is for a declaratory judgment that the 1952 agreement is void insofar as it discriminates, for injunction against all defendants from enforcing the agreement and against the BofRT from representing plaintiffs as long as it does so with discrimination, and for compensatory damages for plaintiffs against all defendants and punitive damages against the BofRT.

The case is now before the court on motions to dismiss (1) by T&NO and (2) by BofRT.

It is clear from the complaint, and even more so when reference is had to the facts established by supporting affidavits, that plaintiffs are contending that a practice of filling vacancies in the engine foreman classification, now carried into the written agreement between the carrier and the union representative, is discriminatory and therefore unlawful and void. A disposition of this contention calls for an interpretation of application of the agreement, and involves a dispute between employees and the carrier-employer under Section 3 of the Act. There is no allegation in the complaint that plaintiffs have ever, prior to the filing of the complaint in this case, complained to the BofRT or to T&NO of the application of the practice in question as being discriminatory to them. The affidavits on file negative any inference that such a complaint has been made to either the representative or the carrier. Plaintiffs say there is no administrative remedy available to them but they have not sought to process any alleged complaint or cause of action through any of the processes available to them under the Railway Labor Act. Any dispute alleged in the complaint is a dispute between the carrier and its employees which is clearly a matter for exclusive determination, at least in the first instance, by the National Railroad Adjustment Board.

The history of the Act is traced by the United States Supreme Court in General Committee, etc. v. Missouri-Kansas-Texas Railroad Company, 320 U.S. 323, at pages 328–333, 64 S.Ct. 146, at page 150, 88 L.Ed. 76, and the cases cited therein. The court there observed that, historically, the present Act and its predecessors placed great areas of dispute within the field of negotiation supplemented by mediation and conciliation, to enforce the Congressional policy. The court then observes, as follows:

"Congress established the National Railroad Adjustment Board for

the settlement of specific types of disputes or grievances between employees and the carrier. § 3. And Congress gave the courts jurisdiction to entertain suits based on the awards of the Adjustment Board. § 3, First (p). That feature of the Act, as well as § 2, Ninth, which placed on the Mediation Board definite adjudicatory functions, transferred certain segments of railway labor problems from the realm of conciliation and mediation to tribunals of the law. * * *

"In short, Congress by this legislation has freely employed the traditional instruments of mediation, conciliation and arbitration. Those instruments, in addition to the available economic weapons, remain unchanged in large areas of this railway labor field. On only certain phases of this controversial subject has Congress utilized administrative or judicial machinery and invoked the compulsions of the law. Congress was dealing with a subject highly charged with emotion. Its approach has not only been slow; it has been piecemeal. Congress has been highly selective in its use of legal machinery. The delicacy of these problems has made it hesitant to go too fast or too far. The inference is strong but Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate.

"That history has a special claim here. It must be kept in mind in analyzing a bill of complaint which, like the present one, seeks to state a cause of action under the Railway Labor Act and asks that judicial power be exerted in enforcement of an obligation which it is claimed Congress has created."

In the General Committee, etc. v. Missouri-Kansas-Texas R. Co. case, the court was confronted primarily with a question of a jurisdictional dispute under Sec. 2, Ninth of the Act and held

that Congress did not select the courts to resolve them; rather, the court said, an administrative remedy is fashioned under the National Mediation Board and the administrative remedy is exclusive, 320 U.S. at page 336, 64 S.Ct. at page 152. In concluding, the court stated:

"Rather the conclusion is irresistible that Congress carved out of the field of conciliation, mediation and arbitration only the select list of problems which it was ready to place in the adjudicatory channel. All else it left to those voluntary processes whose use Congress had long encouraged to protect these arteries of interstate commerce from industrial strife. The concept of mediation is the antithesis of justiciability.

"In view of the pattern of this legislation and its history the command of the Act should be explicit and the purpose to afford a judicial remedy plain before an obligation enforcible in the courts should be implied. Unless that test is met the assumption must be that Congress fashioned a remedy available only in other tribunals. There may be as a result many areas in this field where neither the administrative nor the judicial function can be utilized. But that is only to be expected where Congress still places such great reliance on the voluntary process of conciliation, mediation and arbitration. * * * Courts should not rush in where Congress has not chosen to tread." 320 U.S. at page 337, 64 S.Ct. at page 152.

Also cited are Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61; Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27 v. Toledo, P. & W. Railroad, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534; and Bradley Lumber Company of Arkansas v. N. L. R. B., 5 Cir., 1936, 84 F.2d 97, 100.

In a case decided in this district last year, involving the identical question,

relating to the Brotherhood of Railroad & Steamship Clerks, Freight Handlers, Express and Station Employees, it was held by Judge Kennerly in Conley v. Gibson, 138 F.Supp. 60, that the court was without jurisdiction, affirmed by Per Curiam Opinion of the United States Court of Appeals, Fifth Circuit, Conley v. Gibson, 229 F.2d 436.

And finally, quoting Judge Hutcheson in the case of Hampton v. Thompson, 5 Cir., 1948, 171 F.2d 535, 538:

"What and all that is for decision here, then, is whether the fact, that appellants are Negroes and members of an all Negro railway labor union, entitles them, the Railway Labor Act notwithstanding, to by-pass the National Railroad Adjustment Board and sue direct in the federal courts upon grievances with their employer.

\* \* \* \* \*

"(2) Constitutional amendments and federal statutes, dealing with race or color, were written, they have been interpreted and applied, not to discriminate in favor of Negroes, but to prevent discrimination against them, not to make, but to prevent, a different rule for Negroes than for whites. On page 2 of their reply brief, appellants say: 'It is not necessary to prove that the individual members of the First Division have prejudice against Negroes or that the particular award was the produce of prejudice. All appellants have to prove is that the structure of the First Division is fatally tainted with race discrimination.' When this statement is read in the light of the undisputed facts, indeed the facts admitted and found on this record, it is at once apparent that appellants are using an ancient device, assuming a situation favorable to themselves, in order to get a favorable judgment. In short, begging the question, they put a straw man up to knock him down. The dispute here involves no racial element whatever. The fact that the brakemen in one group are Negroes, in the other whites, has no bearing on the demands of the B.R.T. lodges that they be allowed to run off accumulated mileage, none on the insistence of the colored railway trainmen that none of them should be displaced.

"The doctrine, that in circumstances of this kind a person is entitled to a special tribunal or special treatment because of the color of his skin, has never prevailed in this country, in or out of the courts. If the position taken here should be sustained, the United States and every state must redraft all its laws, remake all its appointments. To say, as appellants in effect say here, that whenever a Negro, not as a Negro but as a person, is concerned in a controversy, he may call in question not the actual prejudice against him of those who are to hear it, but the fact that the hearers have been selected from white organizations which do not admit Negroes to membership, is to introduce a new and strange doctrine. It would be impossible to conform to it. Contrary to the principle of democracy in America, the spirit of its laws, it would be as stupid as it would be wicked to conform to it if conformity were possible. The judgment is affirmed."

I conclude that this court is without jurisdiction and that the motions to dismiss should be granted and sustained. This renders consideration of the other pending motions unnecessary.

Clerk will notify counsel to prepare and submit appropriate order.