UNITED TRANSPORTATION UNION E, GENERAL COMMITTEE OF ADJUST-MENT, former Great Northern Railway and United Transportation Union E, Consolidated General Committee of Adjustment, former Northern Pacific Railway Company, Plaintiffs,

v.

BURLINGTON NORTHERN, INC., Defendant,

and

Brotherhood of Locomotive Engineers, Defendant-Intervenor.

No. 3–71–Civ–193.

United States District Court, D. Minnesota, Third Division.

Oct. 14, 1971.

Rerat, Crill, Foley & Boursier, Patrick J. Foley, Minneapolis, Minn., for plaintiffs.

J. R. Walker and Barry McGrath, St. Paul, Minn., for defendant railroad.

Lindquist & Vennum, Robert V. Atmore, Minneapolis, Minn., for defendant-intervenor.

MEMORANDUM & ORDER

DEVITT, Chief Judge.

In this action plaintiff United Transportation Union seeks to enjoin defend-

ant railroad from implementing any change in the series of agreements between plaintiff, defendant railroad and defendant Brotherhood of Locomotive Engineers insofar as those agreements purport to provide for the use of plaintiffs' seniority list to control the movement of personnel between the engineer and fireman crafts. The matter is here on plaintiffs' motion for a preliminary injunction.

Jurisdiction is asserted under the Railway Labor Act, 45 U.S.C. § 151 et seq., The Declaratory Judgments Act, 28 U.S.C. § 2201, The Interstate Commerce Act, 49 U.S.C. § 1 et seq. and 28 U.S.C. §§ 1331 and 1337.

Historically the railroads have recruited locomotive engineers from those personnel working as locomotive firemen. Prospective engineers are first employed as firemen and placed on seniority rosters in that craft. As a fireman moves up his seniority roster he is exposed to the skills of an engineer. After certain periods, the fireman is examined on his engineering capabilities and if qualified, while retaining his position as a fireman, the individual becomes eligible for promotion to engineer. At this time the individual is placed on the engineer seniority roster and retains his position on the fireman seniority roster. With the number of fluctuations in the demand for engineers, the employees low on the engineer seniority list "ebb and flow" between positions as engineer and fireman.[1]

The Brotherhood of Locomotive Engineers (BLE) for many years has been the bargaining representative for the craft of locomotive engineers working on the predecessor railroads of the Burlington Northern.[2] The predecessor of the United Transportation Union, the Brotherhood of Locomotive Firemen & Enginemen has been the bargaining representative for the craft of locomotive firemen on these railroads.

Prior to the merger which created the Burlington Northern, the component carriers entered into employee protection or merger agreements with both the BLE and the predecessor of the United Transportation Union (UTU). These agreements provided for preservation of employment, guaranteed monthly earnings and the consolidation of seniority rosters and districts on the merged carriers.[3] Subsequent to these agreements the railroad and the unions entered into implementation agreements to effectuate the employee protection and merger plans.

On November 30, 1967 the Interstate Commerce Commission granted the merger applications which sought to create the Burlington Northern. With reference to employee protection the commission required that the provisions of the protection agreements be implemented and applied to all employees. The merger was approved by the Supreme Court as authorized by the ICC on February 2, 1970.

On February 19, 1970 the railroad and the BLE entered into an agreement formulating the basis for consolidation of the engineer seniority rosters on the component lines. This agreement provided:

> Whenever there is subsequently a reduction in the working lists of engineers in a particular zone, and there is a discrepancy in seniority sequence of individuals as shown on the respec-

1. The relationship between the two crafts and the representational problems this relationship has created is well documented. *See*, e. g., Brotherhood of Locomotive Firemen and Enginemen v. National Mediation Board, 133 U.S.App.D.C. 326, 410 F.2d 1025 (1969).

2. The Burlington Northern came into existence by a merger on March 3, 1970 of the former Great Northern; Northern Pacific; Chicago, Burlington & Quincy; Spokane, Portland & Seattle; and the Pacific Coast railroads.

3. These agreements were entered into pursuant to Section 5(2) (f) of the Interstate Commerce Act. 49 U.S.C. § 5(2) (f) and the Railway Labor Act.

tive rosters—the employees in that zone on the seniority rosters as drawn by the firemen's organization, who are the senior firemen on such rosters will be reduced from the engineers' working lists, *after the usual process of displacements.* (Emphasis added)[4]

During May of 1970 the railroad effectuated a reduction in the engineer list in the Pacific Number Five District without first having followed the "usual process of displacements."[5] Failing to resolve the ensuing protest in conference, the BLE and the railroad submitted the dispute to a Disputes Committee pursuant to Section 10 of their agreement. By request of the parties the National Mediation Board established Special Board of Adjustment No. 768 to arbitrate the BLE claim that the carrier was not properly applying the agreement in question in determining which engineers would be reduced from the working lists.

On July 7, 1971 Special Board No. 768 entered an award holding that the BLE was correct in claiming that the railroad was not properly applying the portion of the agreement in question and that the usual process of displacements under the agreement must be carried out prior to determining which engineers would be reduced from the list.

Plaintiffs now claim that firemen working as engineers are governed by the seniority positions they hold as firemen insofar as the "ebb and flow" between the two crafts. Following from this plaintiffs claim that any reduction in the engineer working lists must not take into consideration the usual process of displacement based on the engineer seniority roster but must be determined from the fireman roster. From this premise plaintiffs argue that the decision of Special Board No. 768 conflicts with their interpretation of the February 26, 1970 agreement between the UTU and the railroad and that in following the award of the special board the railroad has violated the contract between it and plaintiffs.

One purpose of the Railway Labor Act, as enunciated in Section 151a(5) is "to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." In accord with this purpose Section 152 of the act places upon all carriers, their officers, agents, and employees the duty to exercise all reasonable efforts to make and maintain agreements concerning pay rates, rules, and working conditions and to settle disputes in order to avoid any interruption to commerce.

Although the act itself does not specifically differentiate between "major" and "minor" disputes, both the legislative history of the act and subsequent case law have elucidated this distinction. A major dispute is said to be one arising out of the formation or change of a collective agreement covering rates of pay, rules or working conditions, Elgin J. & E. Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), while a minor dispute is one arising out of the interpretation or application of a collective agreement. Under Section 153 of the act, minor disputes are settled by an adjustment board whose interpretation

---

4. On February 26, 1970 the UTU and the railroad entered into an agreement which contained the same provision.

5. The term usual process of displacements makes reference to the procedure by which where there is a reduction in a work list, the junior engineers on the list are allowed to exercise their seniority based on their standing on the engineer's seniority roster to replace engineers junior to them on this roster. This results in the displacement of engineers who are then forced to a position of fireman because, after this usual process of displacements, they could no longer hold an engineer's assignment by reason of their standing on the engineers' roster.

of the agreement is binding upon the parties. Detroit and Toledo Shore Line R. R. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). The main distinction between the two types of disputes lies in the procedures established for their rectification and the requirement that in a major dispute neither party may unilaterally alter the status quo. *See*, Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).[6]

Plaintiffs in claiming that the firemen while working in the craft of engineers should be governed by their seniority positions as firemen clearly are looking for an interpretation of the meaning of the agreements of February 19 and February 26, 1970. Specifically, plaintiffs' interpretation that the seniority list drawn by the firemen is to govern the "ebb and flow" between the crafts is based on construction and application of the phrase "after the usual process of displacements." The case thus falls within the definition of a "minor dispute" which is within the exclusive competence of the National Railroad Adjustment Board. Transportation-Communication Employees Union v. Union Pacific R. R., 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1969); *Elgin supra*; and Brotherhood of Locomotive Firemen and Enginemen v. Southern Pacific Co., 447 F.2d 1127 (5th Cir. 1971).

But there is a more persuasive reason for the determination that plaintiffs have sought relief in the wrong forum. At the heart of plaintiffs' assertions lies a jurisdictional claim. In short the issue here is which organization, the UTU or the BLE has representational authority to deal with the railroad concerning seniority in the engineering craft.

The courts have consistently held that the command of the act must be explicit before a court enforcible obligation will be implied. "Unless that test is met the assumption must be that Congress fashioned a remedy available only in other tribunals." General Committee of Adjustment of Brotherhood of Locomotive Engineers for Missouri-Kansas-Texas RR. v. Missouri-Kansas-Texas R. R., 320 U.S. 323, 64 S.Ct. 146, 153, 88 L.Ed. 76 84 (1943).

Plaintiff has sought to frame his complaint in terms of breach of contract alleging that the agreement between the BLE and the railroad as interpreted is inconsistent with the provisions of his contract with the railroad. But in evaluating this claim it is necessary to look through the pleadings to the substance of the allegations. Even where the action is one brought as sounding in contract the courts have no jurisdiction where the validity of the contract depends upon a representational dispute. Brotherhood of Railway and

6. When a "major" dispute is involved the parties first go to conference. If they fail to agree then procedurally the dispute goes to the National Mediation Board. Section 6 of the Act forbids any unilateral action while the dispute is before the Board. Where a "minor" dispute is involved Section 3 of the Act requires that it be settled by an adjustment board whose interpretation of the agreement is binding on the parties. Although there is no provision prohibiting a party from acting unilaterally upon its interpretation of the contract pending exhaustion of the grievance procedures it is the holding of several courts that when the unilateral action threatens irreparable harm after the dispute has been placed in the hands of the adjustment board, the district court may grant injunctive relief. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Airline Division v. Braniff International Airways, 437 F.2d 1272 (5 Cir. 1971); Local Lodge 2144 v. Railway Express Agency Inc., 409 F.2d 312 (2 Cir. 1969). In the instant case sufficient showing of irreparable harm does not appear to have been made to justify such relief. In addition the grievance is not before an adjustment board.

Steamship Clerks, Freight Handlers, Express and Station Employees v. United Air Lines, 325 F.2d 576 (6th Cir. 1963), cert. granted, 377 U.S. 903, 84 S.Ct. 1163, 12 L.Ed.2d 175 (1964), writ dismissed, 379 U.S. 26, 85 S.Ct. 183, 13 L. Ed.2d 173 (1964); Division No. 14, Order of Railroad Telegraphers v. Leighty, 298 F.2d 17 (4th Cir. 1962), cert. denied, 369 U.S. 885, 82 S.Ct. 1160, 8 L. Ed.2d 287 (1962).

Judicial consideration of railway labor disputes is rare, particularly in representational disputes where the National Mediation Board has exclusive jurisdiction. Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); Brotherhood of Locomotive Firemen and Enginemen v. Seaboard Coast Line R. R., 413 F.2d 19 (5th Cir. 1969), cert. denied, 396 U.S. 963, 90 S. Ct. 432, 24 L.Ed.2d 426 (1969). In *Seaboard*, the court said: "The determination as to which labor organization may treat with a railroad regarding a particular issue because of 'an asserted overlapping of the interest of two crafts,' * * * is a representational dispute within the exclusive jurisdiction of the National Mediation Board. * * *" *Seaboard*, at 24.

It seems clear that where the issue involved is one of disputed representation the district court does not have jurisdiction. The dispute here is either one involving a construction of UTU's contract with the railroad or a matter of which organization will represent the crafts involved. As such, the dispute is either a minor dispute or a jurisdictional dispute. Regardless of which approach is taken the resolution of this controversy is not within the jurisdiction of the district court but within the exclusive jurisdiction of the National Railroad Adjustment Board.

Therefore plaintiffs' motion for a preliminary injunction is denied and the action is dismissed for lack of jurisdiction.