Michael L. BROWN, Appellant,

v.

MARYLAND AND PENNSYLVANIA RAILROAD COMPANY, Alfred P. Smith, Scott F. Zeigler and Steven Hill, Appellees.

Superior Court of Pennsylvania.

Argued Sept. 1, 1998.

Filed Nov. 4, 1998.

Joseph C. Korsak, York, for appellant.

Michael A. Pavlick, Pittsburgh, for appellees.

Before JOYCE and HESTER, JJ., and CIRILLO, President Judge Emeritus.

JOYCE, Judge:

This is an appeal from the final order of the trial court sustaining Appellees' preliminary objections to Appellant's complaint. For the reasons set forth below, we affirm. The relevant facts and procedural history of this case are as follows.

Appellant, Michael Brown, was a long-time employee of Appellee, Maryland and Pennsylvania Railroad Company, of which Appel-

lees', Smith, Ziegler and Hill are Chief Executive Officer, Secretary Treasurer and Vice-President respectively. Appellant worked as a laborer servicing and repairing locomotive engines. Prior to 1991, Appellant was paid on an hourly basis and received time and a half for any overtime worked. In 1991, Appellees informed him that he would receive a salary prospectively, without any additional compensation for overtime worked. Appellant was not subject to a collective bargaining agreement at any time.

Appellant initiated the suit in the case at bar pursuant to the Fair Labor Standards Act, 29 U.S.C.A. §201 et seq., Pennsylvania Wage Payment and Collection Act, 43 P.S. §260.1 et seq., and the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §333.101 et seq. On November 6, 1997, the trial court dismissed Appellant's complaint based on Appellees' preliminary objections. In essence, the trial court determined that the state action was preempted by federal law pursuant to the Railway Labor Act, 45 U.S.C.A. §§ 151–188 under the trial judge's mistaken belief that Appellant was subject to a collective bargaining agreement.

Appellant petitioned for reconsideration based on the trial court's erroneous reliance on the alleged collective bargaining agreement. On December 18, 1997, the trial judge purported to grant Appellant's petition for reconsideration acknowledging the erroneous assumption and found that both the Railway Labor Act and the Adamson Act, 45 U.S.C.A. §§ 65–66,[1] rely on the existence of a collective bargaining agreement, which did not exist in the situation at bar and therefore, federal preemption did not apply. However, the trial court lacked jurisdiction to grant reconsideration because more than thirty (30) days had passed subsequent to the court's dismissal of the complaint. Thereafter, Appellant filed this timely appeal from the November order dismissing the complaint.

▆ Before turning to the issue presented for our review, we note that the trial court's opinion purporting to grant reconsid-

---

1. The Adamson Act is now repealed, but was effective for actions commenced prior to October

11, 1996 and thus applies to the case at bar.

eration properly acknowledged that the Railway Labor Act, 45 U.S.C.A. §§151–188 solely applies when a collective bargaining agreement is in existence. However, the trial court erred in determining the Adamson Act's application relied on the existence of a collective bargaining agreement. The Adamson Act provides:

§ 65. Establishment of eight hour day

Eight hours shall, in contracts for labor and service, be deemed a day's work and the measure of standard of a day's work for the purpose of reckoning the compensation for services of all employees who are now or may hereafter be employed by any common carrier by railroad, except railroads independently owned and operated not exceeding one hundred miles in length, electric street railroads, and electric interurban railroads, which is subject to the provisions of subtitle IV of Title 49, and who are now or may hereafter be actually engaged in any capacity in the operation of trains used for the transportation of persons or property on railroads, except railroads independently owned and operated not exceeding one hundred miles in length, electric street railroads, and electric interurban railroads, from any State or Territory of the United States or the District of Columbia to any other State or Territory of the United States or the District of Columbia, or from one place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States: Provided, That the above exceptions shall not apply to railroads though less than one hundred miles in length whose principal business is leasing or furnishing terminal or transfer facilities to other railroads, or are themselves engaged in transfers of freight between railroads or between railroads and industrial plants.

§ 66. Penalty for violation

Any person violating any provision of section 65 of this title shall be guilty of a misdemeanor and upon conviction shall be fined not less than $100 and not more than $1,000, or imprisoned not to exceed one year, or both.

45 U.S.C.A. § 65–§ 66. The rules of statutory construction govern our interpretation. Our object is to ascertain and effectuate the intention of the General Assembly. 1 Pa. C.S.A. § 1921(a). When the language of a statute is clear and unambiguous, it must be given effect in accordance with its plain and common meaning. 1 Pa.C.S.A. § 1921(b); *Commonwealth v. Burnsworth*, 543 Pa. 18, 24, 669 A.2d 883, 886 (1995). In attempting to ascertain the meaning of a statute, we must consider the intent of the legislature and examine the practical consequences of a particular interpretation. *Commonwealth v. Davis*, 421 Pa.Super. 454, 618 A.2d 426, 428 (Pa.Super.1992). We presume the legislature did not intend a result that is absurd and unreasonable. *Id.*

We believe that the statute is clear and unambiguous on its face. Therefore, it must be given effect in accordance with its plain and common meaning. Conspicuously absent from the language of the statute is reference to an existing collective bargaining agreement. Because the statute does not mention such a prerequisite, we decline to imply its necessity. We now turn to Appellant's claim.

■ The sole issue raised for our review is whether the Adamson Act preempts Appellant's state law claims for overtime compensation.

Where a preliminary objection in the nature of a demurrer is sustained, an appellate court's review is limited. All material facts set forth in the complaint as well as all inferences reasonably deducible therefrom are admitted as true for the purpose of this review. The question presented by demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it.

*Moser v. Heistand*, 545 Pa. 554, 559, 681 A.2d 1322, 1325 (1996) (citation omitted). We need not accept a party's allegations as true to the extent they constitute conclusions of law, however. *Scarpitti v. Weborg*, 530 Pa. 366, 368, 609 A.2d 147, 148 (1992).

The exercise of federal supremacy is not lightly to be presumed. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so.... [W]here Congress has not made clear its intention to preempt or where the conflict is a potential one or peripheral to the purpose of the federal statute, state legislation will be allowed to stand. Federal regulation of a field of commerce should not be deemed preemptive of state regulatory power unless the nature of the regulated subject matter permits no other conclusion or Congress has unmistakenly so ordained. The Supreme Court in certain contexts has resolved the preemption issue on the basis of whether a state enactment frustrates any part of the purpose of the federal legislation. While prior cases on preemption are not precise guidelines, because each case turns on the peculiarities and special features of the federal regulatory scheme in question, it is clear that federal preemption is not lightly to be presumed, but where there is a pervasive and comprehensive scheme of federal regulation, particularly when the subject is one traditionally committed to federal regulation, state enactments which stand as a major obstacle to the accomplishment of Congressional objectives are invalid.

*National Association of Regulatory Util. Com'rs v. Coleman*, 399 F.Supp. 1275, 1278 (M.D.Pa.1975) (citations and quotation marks omitted).

A comprehensive history of railroad regulation aids in our determination.

The earliest federal legislation regarding interstate railroads is the Pacific Railroad Act of 1862, ch. 120, 12 Stat. 489, which granted rights of way through public lands so that a transcontinental rail system could be established. In 1887, Congress enacted the Interstate Commerce Act of Feb. 4, 1887, 24 Stat. 379, which established the Interstate Commerce Commission (ICC) to comprehensively regulate rail shipping in interstate commerce. Congress then enacted the Arbitration Act of 1888 as a means of smoothing railroad labor rela-

tions in order to avoid strikes which would seriously disrupt the stream of interstate commerce by rail....

In the twentieth century, Congress continued to exercise its power in the area of railroad labor matters. In 1907, Congress enacted the Hours of Service Act (HAS), 45 U.S.C. sections 61–64(b) to promote safety by limiting the hours various types of railroad employees could work consecutively. In 1916, Congress enacted the Adamson Act, 45, U.S.C. sections 65–66, in response to threatened strikes by railroad unions due to the railroads' refusal to adopt an eight-hour day or pay time and a half for overtime. The Adamson Act mandates that eight hours constitute the standard workday of railroad employees, but leaves employers and employees free as to the subject of wages to govern their relations by their own agreements. In 1926, Congress enacted the Railway Labor Act, 45 U.S.C. sections 151–188, which imposes a duty on rail carriers and their employees to reach agreements concerning rates of pay, rules, and working conditions, and creates mandatory grievance resolution procedures.

Congress has regulated numerous other aspects of the railroad industry. As early as 1893, Congress began enacting a series of acts known collectively as the Safety Appliance and Boiler Inspection Acts, 45 U.S.C. sections 1–43a which requires safety equipment for railroad equipment used in interstate commerce. More recently, Congress enacted the Federal Railroad Safety Act of 1970 (FRSA), 45 U.S.C. sections 421–447 to reduce rail-related accidents by authorizing the promulgation of federal railroad safety regulations....

In perhaps the most striking example of its concern with interstate rail operations, Congress enacted the Regional Rail Reorganization Act of 1973, 45 U.S.C. sections 701–797m, which responded to the bankruptcy of eight northeastern and midwestern railroads by combining them into the Consolidated Rail Corporation (Conrail), a private, for-profit corporation.

*R.J. Corman R.Co. v. Palmore*, 999 F.2d 149, 151–152 (6th Cir.1993) (citations and quota-

tion marks omitted). Apparent in this extensive history of railroad regulation is that Congress has undertaken to regulate almost all aspects of the railroad industry from safety to labor relations and working conditions. The overtime regulations challenged here clearly fall within the ambit of areas which Congress delineated to federal regulation.

■ Although not binding on our Court, we are persuaded by the sound reasoning set forth by a panel of the 6th Circuit of the Federal Courts. In a challenge to a Kentucky statute regulating overtime paid to railroad employees, the court while analyzing the Adamson Act's preemptive effect, noted:

Here, Kentucky has ignored Congress's aim in enacting the Adamson Act, which was to provide a uniform workday for railroad employees, yet leave the amount of compensation to labor agreements....

Kentucky has encroached on a legislative area viewed by Congress as most appropriately governed by uniform federal regulation. As stated by the Supreme Court: The Federal Government has determined that a uniform regulatory scheme is necessary to the operation of the national rail system. In particular, Congress long ago concluded that federal regulation of railroad labor relations is necessary to prevent disruptions in vital rail service essential to the national economy. A disruption of service on any portion of the interstate railroad system can cause serious problems throughout the system.... To allow individual states to circumvent any of the elements of federal regulation of railroads, would destroy the uniformity thought essential by Congress and would endanger the efficient operation of the interstate rail system....

*Id.* at 153–154.

Further, the court noted:

Kentucky responds that by finding its overtime law preempted, we leave plaintiff's employees without any overtime wage protection either in the form of the state statute or a collective bargaining agreement. We do not dispute the truth of this observation, but we do not agree that the employees are left entirely without recourse. Plaintiffs' employees, like all railroad employees, may bargain collectively under the RLA to resolve disagreements in labor relationship.

*Id.* at 154. Based on the longstanding goals of Congress in providing consistency in applying the law in an area which so heavily pervades interstate commerce, we too are compelled to find that the intent of Congress is that the area of overtime regulation for railroad employees is preempted by federal law and the trial court did not err in its determination. Finding no basis upon which to disturb the findings of the trial court, we affirm.

Order affirmed.

CIRILLO, President Judge Emeritus, files concurring statement.

CIRILLO, President Judge Emeritus, concurring:

I agree with the ultimate result reached by the majority. I write separately, however, to offer an additional reason why the Adamson Act, 45 U.S.C.A. §§ 65–66, does not apply solely to instances where a collective bargaining agreement is in existence.

Unlike the Railway Labor Act, 45 U.S.C.A. §§ 151–188, which was enacted to "eliminate the crippling effect of labor disputes that threaten railway interstate commerce," *Espinosa v. Norfolk and Western Railway Co.*, 946 F.2d 894 (6th Cir.1991), the Adamson Act (the Act) was enacted as a governmental measure to fix a permanent standard working day for employees engaged in the operation of trains upon interstate railway carriers. The Act was also instituted to make a temporary wage regulation which establishes a permanent eight-hour standard for a day's work by such employees. *Wilson v. New, et al., Receivers of the Missouri, Oklahoma & Gulf Railway Co.*, 243 U.S. 332, 37 S.Ct. 298, 61 L.Ed. 755 (1917). *See also General Committee of Adjustment of the Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas Railroad Co.*, 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943) (Adamson Act provided for an eight-hour day for train operators and a commission to enforce it).

Therefore, I agree that the trial court was not foreclosed from reviewing Appellant's claim under the Adamson Act because he did not have a collective bargaining agreement with his employer. *Cf. Espinosa* (the Railway Labor Act relies upon the existence of a collective bargaining agreement because it "provides the exclusive mechanism for resolving employment disputes that arise out of the collective bargaining agreement."). I would focus, however, upon the statutory intent of the Adamson Act to illustrate that a collective bargaining agreement is not a prerequisite to the Act's application.