## PENNSYLVANIA RAILROAD SYSTEM AND ALLIED LINES FEDERATION NO. 90, ET AL. *v.* PENNSYLVANIA RAILROAD COMPANY, ET AL.

**APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.**

No. 661. Argued January 13, 1925.—Decided March 2, 1925.

1. Since, as decided in *Pennsylvania Railroad Co.* v. *Labor Board,* 261 U. S. 72, the provisions of Title III of the Transportation Act, 1920, seeking to promote adjustment of disputes between carriers and their employees through conferences and through decisions of

the Railroad Labor Board, rely only upon the moral sanction of public opinion and do not grant rights enforceable in a court of law, a carrier, in dealing with its employees concerning wages and working conditions, is not bound by rulings of the Board affirming the right of any craft or class to select a trade union as their representative, but may substitute an election whereby only individuals, chosen regionally, are elected and votes for a union are rejected; may refuse to allow furloughed employees to vote in the election, and may even threaten discharge of employees who do not consent to the agreement made with the representatives elected. P. 210.

2. These things, being within the legal rights of a railroad company, are not subject to be enjoined, at the suit of a union composed of existing and former employees, upon the ground that the company and its officers, in doing them, are guilty of a conspiracy both at common law and under § 19 of the Criminal Code. *Id.*

3. Denial of the prayer for equitable relief and dismissal of the main part of the bill carries with it incidental claims for damages, without prejudice to their prosecution at law by individual claimants. P. 218.

1 Fed. (2d) 171, affirmed.

APPEAL from a decree of the Circuit Court of Appeals which affirmed a decree of the District Court (296 Fed. 220) dismissing the bill in a suit brought by a union, composed of present and former workers of the Pennsylvania Railroad Company, to enjoin the corporation and its officers from carrying out an alleged conspiracy to defeat the provisions of the Railroad Labor Board legislation and to deprive the employees of rights under it. Damages also were prayed. The case is fully stated in the opinion.

*Mr. Morris Hillquit* and *Mr. David Wallerstein* for appellants.

*Mr. John Hampton Barnes* for appellees.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

The Pennsylvania Railroad System and Allied Lines Federation No. 90, by its bill in equity herein against the

Pennsylvania Company and its officers, continued the controversy which was considered in *Pennsylvania Railroad Company* v. *Labor Board,* 261 U. S. 72. The Company filed an answer, and the case was heard in the District Court for the Eastern District of Pennsylvania on exhibits and evidence. The District Court dismissed the bill, 296 Fed. 220, and the decree was affirmed in the Third Circuit Court of Appeals, 1 Fed. (2d) 171. The issues involve the construction and application of Title III of the Transportation Act of 1920, Ch. 91, 41 Stat. 456, 469. The Title provides a method for the settlement of disputes over wages, rules and working conditions between railroad companies engaged in interstate commerce and their employees, and, as a means of securing it, creates the Railroad Labor Board and defines its functions and powers.

The Pennsylvania Railroad System and Allied Lines Federation No. 90 is a trades union of 50,000 employees or more affiliated with the American Federation of Labor, and embracing those crafts which have to do with the mechanical part of railroad service. It contains as members only workers, or those who have been workers, in the employ of the Pennsylvania Company or its Allied Lines. Our statement of the case and the opinion in what we shall call the Labor Board case show the dealings between the Company and Federation No. 90 down to and beyond the time when the Transportation Act was passed and the railroad property was turned back by the Government to the Company. The Railroad Labor Board, April 14, 1921, decided that the *modus vivendi* under which rules and working conditions under the Railroad Administration had continued should end July 1, 1921, and called upon each carrier and its respective employees to designate representatives to confer and decide, so far as possible, respecting their future rules and working conditions and to keep the Board advised of the progress toward agreement. The Board accompanied their announcement,

known as Decision 119, with a statement of rules of decision which it intended to follow in consideration of the settlement of disputes under Title III. The two which are relevant here, as they were in the case cited, are as follows:

" 5. The right of such lawful organization [i. e. trade unions] to act toward lawful objects through representatives of its own choice, whether employees of a particular carrier or otherwise, shall be agreed to by management."

" 15. The majority of any craft or class of employees shall have the right to determine what organization shall represent members of such craft or class. Such organization shall have the right to make an agreement which shall apply to all employees in such craft or class. No such agreement shall infringe, however upon the right of employees not members of the organization representing the majority to present grievances either in person or by representatives of their own choice."

Officials of Federation No. 90 met the representatives of the Pennsylvania Railroad Company, in compliance with the request of the Board, in May, 1921. The Pennsylvania representatives refused to confer, on the ground that the Federation did not represent a majority of the employees of the system, and proposed to send out a form of ballot to their employees asking them to designate their representatives. The Federation officers objected, because the ballot made no provision, in accordance with principles 5 and 15, for the representation of employees by a trade union, but specified that they must be natural persons and such only as were employees of the Pennsylvania Company; and further because the Company required that the representatives of the employees should be selected regionally rather than from the craft in the whole system, in compliance with Principle No. 15. The result was that two ballots were sent out, one by the Company and the other by the Federation. These forms were both

found objectionable by the Board, which by its decision No. 218 ordered a new election for which rules were prescribed and a form of ballot specified on which labor organizations, as well as individuals, could be voted for as his representatives at the option of the employee. The Pennsylvania Company applied to the Board to vacate this decision, on the ground that there was no dispute before the Board of which by Title III of the Transportation Act the Board was given jurisdiction. After a rehearing the Board confirmed its original decision. The action of the Company in refusing to comply with the decision of the Board as to the manner of holding the elections led to a vote among the members of the Federation No. 90 as to whether they should strike against the Company because of such vote. There was an affirmative vote and some 20,000 struck. A bill was brought by the Pennsylvania Company to enjoin the Labor Board from hearing the controversy instituted by Federation No. 90 over the election of representatives who should act for the employees in the conferences proposed with the Company. It was first objected that the Federation No. 90 had no standing or capacity to invoke the hearing of the dispute because a labor union; second, that the controversy did not involve the kind of dispute of which the Board could take cognizance under the Act, because the question who should represent the employees as to grievances, rules and working conditions was not within the jurisdiction of the Labor Board to decide; and, third, the Board had no right to publish its opinion condemning the action of the Company as it proposed to do, because that only applied to final decisions of a dispute over wages or working conditions. The position of the Company was not sustained by this Court. It was held that a labor union could invoke the Board's action, that the question who should be recognized as representatives of the employees was not only before the Board but involved one of the most im-

portant of the rules and working conditions in the opera-
tion of a railroad, and that such a decision could there-
fore be made public if the Board deemed it wise and
proper. The District Court in which the suit was brought
had enjoined the Labor Board from hearing the dispute
and from publishing its opinion. Notwithstanding the
opinion of the Board, the Pennsylvania Company pro-
ceeded to carry out its original method of selecting em-
ployees' representatives and their regional distribution.
It refused to allow its employees to vote for the Federa-
tion No. 90 as their representative, and where ballots
were cast, as happened in some of the voting places, for
the Federation No. 90 in a great majority, individuals,
though they had but a small minority of votes, were de-
clared elected as representatives by the Company. The
Company's plan brought together in the organizations an
equal number of officers and of employees' representa-
tives, with the restriction that no action should be taken
indicating agreement unless two-thirds of the body acting
should concur. The Company paid the expenses of the
organizations and such permanent officers as they had
were put upon the pay roll of the Company. It instituted
a trade organization with which the Company proposed
to deal and has dealt, although the evidence conclusively
showed that it did not, at the time of the election cer-
tainly, represent a majority of the employees. The Com-
pany and the employees whom it recognized as the repre-
sentatives of its employees came to an agreement in re-
spect to wages and working conditions and have induced
many employees to sign such agreement. This agreement
took effect as of July 1, 1921.

The bill in this case was filed to enjoin what was charged
to be a conspiracy by the Pennsylvania Company and its
officers to defeat the provisions of the Act and deprive the
employees of their rights with which the provisions of
Title III of the Act intended to vest them in their deal-

ings with the Company; averring that in the effort to deprive them of their proper representation and to maintain the plan of the Company, the Company resorted to coercion with threats of discharge, and further violated their rights by preventing a large number of employees who were furloughed from casting their vote in the elections.

The complainants further contend, first that all furloughed employees, who in July, 1921, were refused reëmployment in accordance with their seniority rights, should recover wages for the time the Company has denied them reëmployment at former wages; that employees who, having worked a year from July, 1921, to July, 1922, were discharged by the Company for refusing to waive their rights under the Transportation Act, were entitled to recover the difference between the rate paid and what they were entitled to under a wage decision of the Board in June, 1921; and, finally, that a large number of the Company's employees, members of Federation No. 90, who were not furloughed in 1921 and did not strike in the summer of 1922, but continued at work under the wages, rules and conditions established by the Company's alleged unlawful agreement, are entitled to be paid by the Company the difference between the amounts actually received by them and the amount they should have received at the rate of wages in force before the first of July, 1921. The contention is that complainants in this their representative suit and as incident to the main relief sought by injunction, may have an accounting of damages sustained by the members of the Federation No. 90 in the premises.

The prayer of the bill is for a decree enjoining the defendant, the Pennsylvania Company, from enforcing the provisions of the agreement with respect to wages and working conditions made as of July 1, 1921, between it and its employees under its plan on the vote taken, from en-

42684°—25——14

forcing any change in rules and working conditions as they existed on June 30, 1921, that is as they existed under a previous national agreement entered into while the property was under federal control, from continuing to deal with persons chosen on the Company's ballots as the representatives of the employees engaged in mechanical work, and from financing, interfering with, directing and controlling the organizations of the Company's employees for the purposes set forth in the Transportation Act, and from refusing to confer and deal with Federation No. 90 as the organization representing the great majority of the Company's employees engaged in such work.

The whole case for Federation No. 90 rests upon the contention that the conduct of the Company and its officers is a statutory offense in the nature of a conspiracy under the provisions of Section 19 of the Criminal Code, which provides that if two or more persons conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the laws of the United States, they shall be punished; and further that injunction will lie to restrain the means for promoting such conspiracy. Moreover, it is claimed that this is a conspiracy at common law, because it is a combination to accomplish an unlawful result by unlawful means, and actionable. Citing *Pettibone* v. *United States,* 148 U. S. 197, and *Duplex* v. *Deering,* 254 U. S. 465. The whole issue, therefore, is whether the provisions of Title III, in pointing out what Congress wished the parties to the dispute to do, was intended by Congress to be a positive, obligatory law, creating an enforceable duty such that a combination by the Company and, its officials to violate it is a conspiracy. Title III we have already construed in the *Labor Board Case* in 261 U. S. 72. We quote from the statement in that case:

"Title III of the Transportation Act of 1920 bears the heading 'Disputes Between Carriers and their Employees and Subordinate Officials'.

" Section 301 makes it the duty of carriers, their officers, employees and subordinate officials, to exert every reasonable effort to avoid interruption to the operation of an interstate commerce carrier due to a dispute between the carrier and its employees, and further provides that such disputes shall be considered and if possible decided ' in conference between representatives designated and authorized so to confer by the carriers, or the employees or subordinate officials thereof, directly interested in the dispute'.

" The section concludes—

" ' If any dispute is not decided in such conference, it shall be referred by the parties thereto to the board which under the provisions this title is authorized to hear and decide such dispute'.

" Section 302 provides for the establishment of railroad boards of adjustment by agreement between any carrier, groups of carriers, or the carriers as a whole, and any employees or subordinate officials of carriers, or organization or group of organizations thereof. No such boards of adjustment were established when this controversy arose.

" Section 303 provides for hearing and decision by such boards of adjustment upon petition of any dispute involving only grievances, rules or working conditions not decided as provided in Sec. 301.

" Sections 304, 305 and 306 provide for the appointment and organization of the ' Railroad Labor Board ' composed of nine members, three from the Labor Group, three from the Carrier Group, and three from the Public Group.

" Section 307(a) provides that when a labor adjustment board under Sec. 303 has not reached a decision of a dispute involving grievances, rules or working conditions in a reasonable time, or when the appropriate adjustment board has not been organized under Sec. 302, the Railroad Labor Board ' (1) upon the application of the chief execu-

tive of any carrier or organization of employees or subordinate officials whose members are directly interested in the dispute, (2) upon a written petition signed by not less than 100 unorganized employees. or subordinate officials directly interested in the dispute, or (3) upon the Labor Board's own motion if it is of the opinion that the dispute is likely substantially to interrupt commerce, shall receive for hearing, and as soon as practicable and with due diligence decide, any dispute involving grievances, rules or working conditions which is not decided as provided in section 301 '.

" Paragraph (b) of the same section provides for a hearing and. decision of disputes over wages.

" Paragraph (c) makes necessary to a decision of the Board the concurrence of five members, of whom, in the case of wage disputes, a member of the Public Group must be one. The paragraph further provides that

" ' All decisions of the Labor Board shall be entered upon the records of the board and copies thereof, together with such statement of facts bearing thereon as the board may deem proper, shall be immediately communicated to the parties to the dispute, the President, each Adjustment Board and the [Interstate Commerce] Commission, and shall be given further publicity in such manner as the Labor Board may determine.'

" Paragraph (d) requires that decisions of the Board shall establish standards of working conditions which in the opinion of the Board are just and reasonable.

" Section 308 prescribes other duties and powers of the Labor Board, among which is that of making ' regulations necessary for the efficient execution of the functions vested in it by this title '.

" Section 309 prescribes that

" ' Any party to any dispute to be considered by an Adjustment Board or by the Labor Board shall be entitled to a hearing either in person or by counsel '.

" Section 313 is as follows:

" ' The Labor Board, in case it has reason to believe that any decision of the Labor Board or of an Adjustment Board is violated by any carrier, or employee or subordinate official, or organization thereof, may upon its own motion after due notice and hearing to all persons directly interested in such violation, determine whether in its opinion such violation has occurred and make public its decision in such manner as it may determine.' "

This Court's construction of the effect of these provisions is shown in the opening language of the opinion, as follows:

(Page 79.) " It is evident from a review of Title III of the Transportation Act of 1920 that Congress deems it of the highest public interest to prevent the interruption of interstate commerce by labor disputes and strikes, and that its plan is to encourage settlement without strikes, first, by conference between the parties; failing that, by reference to adjustment boards of the parties ' own choosing, and if this is ineffective, by a full hearing before a National Board appointed by the President, upon which are an equal number of representatives of the Carrier Group, the Labor Group, and the Public. The decisions of the Labor Board are not to be enforced by process. The only sanction of its decision is to be the force of public opinion invoked by the fairness of a full hearing, the intrinsic justice of the conclusion, strengthened by the official prestige of the Board, and the full publication of the violation of such decision by any party to the proceeding. The evident thought of Congress in these provisions is that the economic interest of every member of the Public in the undisturbed flow of interstate commerce and the acute inconvenience to which all must be subjected by an interruption caused by a serious and widespread labor dispute, fastens public attention closely on all the circumstances of the controversy and arouses

public criticism of the side thought to be at fault. The function of the Labor Board is to direct that public criticism against the party who, it thinks, justly deserves it."

Another passage is as follows:

(Page 83.) "The second objection is that the Labor Board in Decision 119 and Principles 5 and 15, and in Decision 218, compels the Railroad Company to recognize labor unions as factors in the conduct of its business. The counsel for the Company insist that the right to deal with individual representatives of its employees as to rules and working conditions is an inherent right which can not be constitutionally taken from it. The employees, or at least those who are members of the labor unions, contend that they have a lawful right to select their own representatives, and that it is not within the right of the Company to restrict them in their selection to employees of the Company or to forbid selection of officers of their labor unions qualified to deal with and protect their interests. This statute certainly does not deprive either side of the rights claimed.

"But Title III was not enacted to provide a tribunal to determine what were the legal rights and obligations of railway employers and employees or to enforce or protect them. Courts can do that. The Labor Board was created to decide how the parties ought to exercise their legal rights so as to enable them to coöperate in running the railroad. It was to reach a fair compromise between the parties without regard to the legal rights upon which each side might insist in a court of law. The Board is to act as a Board of Arbitration. It is to give expression to its view of the moral obligation of each side as members of society to agree upon a basis for coöperation in the work of running the railroad in the public interest. The only limitation upon the Board's decisions is that they should establish a standard of conditions, which,

in its opinion, is just and reasonable. The jurisdiction of the Board to direct the parties to do what it deems they should do is not to be limited by their constitutional or legal right to refuse to do it. Under the act there is no constraint upon them to do what the Board decides they should do except the moral constraint, already mentioned, of publication of its decision."

A third passage is as follows:

(Page 85.) " It is not for this or any other court to pass upon the correctness of the conclusion of the Labor Board if it keeps within the jurisdiction thus assigned to it by the statute. The statute does not require the Railway Company to recognize or to deal with, or confer with labor unions. It does not require employees to deal with their employers through their fellow employees. But we think it does vest the Labor Board with power to decide how such representatives ought to be chosen with a view to securing a satisfactory coöperation and leaves it to the two sides to accept or reject the decision. The statute provides the machinery for conferences, the hearings, the decisions and the moral sanction. The Labor Board must comply with the requirements of the statute; but having thus complied, it is not in its reasonings and conclusions limited as a court is limited to a consideration of the legal rights of the parties."

It is clear from this language that in the *Labor Board Case* this Court has decided that there is nothing compulsory in the provisions of the statute as against either the Company or the employees upon the basis of which either acquired additional rights against the other which can be enforced in a court of law. The language of the Title is a legal definition of the jurisdiction and duty of the Railroad Labor Board in attempting to settle the controversies between the railroad employer and its employees, and where the Labor Board exceeds its jurisdiction and violates the provisions describing its functions, it

may be subject to judicial restraint at the complaint of
any properly interested party. The so-called mandatory
language of Section 301 might, if that section were accom-
panied by a penalty for its violation or some other means
of compulsion, and there were not the other provisions of
the Title to help its construction, be given the force of a
statutory obligation of the parties to a dispute. There
are two Sections, 310 and 311, in this Title, which do
furnish instances of judicial compulsion in the matter
of securing evidence and the production of records to
promote the efficient administration of the functions
vested in the Labor Board by the Title. And there is
Section 312 which required that carriers until September
1, 1920, should continue to pay wages not less than those
paid March 1, 1920, and fixed a penalty for each viola-
tion of this obligation and gave a right to the United
States to a civil suit to recover the penalty. But when
the other sections of the Title are taken as a whole, they
may be searched through in vain to find any indication
in the mind of Congress or any intimation that the dis-
putants in the controversies to be anticipated were in
any way to be forced into compliance with the statute or
with the judgments pronounced by the Labor Board,
except through the effect of adverse public opinion.

What the complainants here are seeking to do is to
enforce by mandatory injunction a compliance with a
decision of the Board, not based on the legal rights of
the parties, but on its judgment as to what legal rights
the disputants should surrender or abate in the public in-
terest and in the interest of each other, to maintain
harmonious relations between them necessary to the con-
tinuance of interstate commerce, and to avoid severing
those relations as they would have the strict legal right
to do. Such a remedy by injunction in a court, it was
not the intention of Congress to provide.

The ultimate decision of the Board, it is conceded, is
not compulsory, and no process is furnished to enforce it,

but it is urged that the preliminary steps are not the final decision, and it will make the Act meaningless and wholly ineffective if under the Act the parties may not be forced to a conference and to a contest before the Labor Board. This very point was considered by us in the *Labor Board Case* and we held that the questions how the representatives of each side should be selected and whom the Board should recognize as accredited representatives were of primary importance affecting the working conditions of the railroad, and such decisions, therefore, must be regarded, although preliminary, as of the same class of decisions as those with respect to wages and ultimate working conditions. The same sanction, therefore, of publication and public opinion, exists for them and nothing else.

The Pennsylvania Company is using every endeavor to avoid compliance with the judgment and principles of the Labor Board as to the proper method of securing representatives of the whole body of its employees, it is seeking to control its employees by agreements free from the influence of an independent trade union, it is, so far as its dealings with its employees go, refusing to comply with the decisions of the Labor Board and is thus defeating the purpose of Congress. Appellants charge that the Company is attempting, by threats to discharge its employees, to secure their consent to the agreement of July 1, 1921, as to wages and working conditions agreed to by the representatives of its employees it declared elected. This is denied, though there is some evidence tending to support the charge. All these things it might do and remain within its strict legal rights after it came fully into control of its railroad property subsequent to September 1, 1920. We do not think Congress, while it would deprecate such action, intended to make it criminal or legally actionable. Therefore, the bill of complaint does not aver a conspiracy and without that, equitable relief can not be granted.

We come now to the prayer for an allowance of damages to Federation No. 90, suing on behalf of its members. The claims are, first, for certain employees who, being on furlough when they were notified to return to work on a scale of wages made effective by the Company July 1, 1921, refused to return except on the old scale prevailing September 1, 1920. They seek wages on the old scale though they did not work. Second, for certain employees who worked under this Company scale for a year and then struck. They seek a recovery for the difference between the old and the new scale established by the Company. Third, for certain employees who did not strike at all and accepted wages at the new scale till the filing of the bill. They seek recovery for the difference between the old scale and the new scale which they accepted.

It is argued that the new scale was illegal because not fixed by the Labor Board under Title III after a hearing and therefore the only legal scale was that which prevailed before. We do not find it necessary to consider these claims on their merits. Even if the Federation No. 90 and its members as representatives in a class suit in equity could recover such claims as damages incidental to granting the main equitable relief prayed for, the denial of the prayer for the equitable relief and the dismissal of the main part of the bill carries with it such incidental claims without prejudice to their prosecution at law by individual claimants as they may be advised. Our conclusions on the merits of the main issue and the damage claims have made it unnecessary for us to consider objections made to the representative capacity of the complainants to maintain the bill.

*Decree affirmed.*