M. SMITH, Circuit Judge,
dissenting:
I respectfully dissent.[1] The majority concludes that Section 2, First of the Railway Labor Act (RLA),[2] 45 U.S.C. § 152, First (Section 2, First), imposes an unprecedented, amorphous duty to refrain from striking on the Airline Services International fuellers (Fuellers), while imposing no duty to negotiate on Airline Services International (ASIG) before it sought the injunction at issue in this case, despite the clear language of Section 8 of the Norris LaGuardia Act (NLGA), 29 U.S.C. § 108. The injunction upheld by the majority portends the reinsertion of federal courts into the “labor injunction business,” Marine Cooks & Stewards, AFL v. Pan. S.S. Co., 362 U.S. 365, 369, 80 S.Ct. 779, 4 L.Ed.2d 797 (1960), in violation of the language of the NLGA stripping federal courts of the authority to issue injunctions related to labor disputes in most instances.
I. History
A. History of the NLGA
As the Supreme Court has observed, “[t]he Railway Labor Act cannot be appreciated apart from the environment out of *1124 which it came and the purposes which it was designed to serve.” Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps., 481 U.S. 429, 444, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987) (internal quotations omitted). Towards the end of the nineteenth century and the beginning of the twentieth, the federal judiciary issued a large number of labor injunctions. Pejoratively called “government by injunction,” judicial interference in labor relations became an issue of national importance by the end of the nineteenth century. See 1 The Developing Labor Law 7 (John E. Higgins, Jr. & Patrick Hardin eds., 4th ed.2002). Nearly every congress between 1894 and 1914 considered proposals to restrict the judiciary’s injunctive power. See Felix Frankfurter and Nathan Greene, The Labor Injunction 163 (New York, 1930).
Congress first attempted to strip federal courts of jurisdiction to issue labor injunctions when it passed the Clayton Act in 1914.[3] The Supreme Court, however, narrowly construed the Clayton Act in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), and “[djuring the 1920’s, courts issued over 2,100 anti-strike decrees.... ” Forbath, Law and the Shaping of the American Labor Movement 1227 (1991). Congress, however, remained “intent upon taking the federal courts out of the labor injunction business,” Marine Cooks, 362 U.S. at 369, 80 S.Ct. 779, and it passed the NLGA, which broadly stripped federal courts of jurisdiction to issue injunctions in labor disputes, in 1934.[4] “[I]n passing the Norris-LaGuardia Act, Congress described federal labor injunctions unequivocally as abuses of judicial power.” Burlington N. Santa Fe Ry. Co., 203 F.3d 703, 709 (9th Cir.2000) (en banc) (internal quotations omitted). As the Supreme Court later described it, the NLGA was an “extraordinary step ... necessary to remedy an extraordinary problem.” Burlington N. R.R. Co., 481 U.S. at 437, 107 S.Ct. 1841.[5]
B. History of the RLA
Congress did not intend to leave a regulatory vacuum in place of judicial intervention in labor relations. Rather, it sought to replace ad hoc “government by injunction” with a means by which carriers and organized labor could amicably settle their disputes without government intervention, and without disrupting rail service and the national economy. After a number of legislative false starts, representatives of both the railway carriers and labor unions met *1125 to draft a bill that would be mutually satisfactory.[6] The product of their cooperation was the RLA. See Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 758, 81 5.Ct. 1784, 6 L.Ed.2d 1141 (1961) (“It is accurate to say that the railroads and the railroad unions between them wrote the Railway Labor Act of 1926 and Congress formally enacted their agreement.”).[7]
This history reveals two principles that cut against the majority’s construction of the RLA. First, courts should be wary of involving themselves in labor disputes in light of Congress’s goal of “taking the federal courts out of the labor injunction business.” Marine Cooks, 362 U.S. at 369, 80 S.Ct. 779. Second, the RLA represents a compromise between labor and management, in which each group sacrificed some avenues of self help in exchange for certain protections. The majority’s opinion violates both principles.
II. Discussion
A district court “has jurisdiction and power to issue necessary injunctive orders (to enforce compliance with the requirements of the Railway Labor Act) notwithstanding the provisions of the Norris-La-Guardia Act.” Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co., 353 U.S. 30, 42, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957) (citing Bhd. of R.R. Trainmen v. Howard, 343 U.S. 768, 774, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952)). However, “while federal courts may issue injunctions in labor disputes to compel the parties to fulfill their obligations under the RLA, when no such duties exist, the Norris-LaGuardia Act controls.” Fed. Express Corp. v. Teamster Union, Local No. 85, of Int’l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am., S.F., Cal., 617 F.2d 524, 526 (9th Cir.1980) (citations omitted). In determining whether such duties exist, “[t]he specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act.” Chi. R. & I.R. Co., 353 U.S. at 42, 77 S.Ct. 635. A review of the cases applying these principles shows that labor injunctions in industries covered by the RLA have been found to be appropriate in two contexts: first, where parties fail to adhere to a specific duty in the RLA, including a duty to participate in the RLA’s dispute resolution procedures;[8] and second, where parties attempt to achieve ends provided for in the RLA without following the corresponding RLA procedures.[9]
*1126 Thus, the Fuellers “do not need to find a particular provision in the RLA to justify [striking]. [Instead] [t]he affected [carrier] must find a specific mandate of the RLA that prohibits the [strike].” Ry. Labor Execs. Ass’n v. Wheeling & Lake Erie Ry. Co., 914 F.2d 53, 56 (4th Cir.1990). Further, the RLA mandate underlying the injunction must be both clear and unambiguous. Burlington N. R.R. Co., 481 U.S. at 446, 107 S.Ct. 1841. (“Faced with a choice between the ambiguity in the RLA and the unambiguous mandate of the Norris-LaGuardia Act, we choose the latter.”); see also, e.g., Pan Am. World Airways, Inc. v. Int’l. Bhd. of Teamsters, 894 F.2d 36, (2d Cir.1990) (finding that the RLA did not impose a specific mandate on employees to refrain from intermittent work stoppages). In light of the above, the key question in this case is whether the RLA imposes a clear and unambiguous duty on the Fuellers to refrain from striking. I conclude that it does not.
A. Section 152, First Does Not Impose a Duty on the Fuellers to Refrain from Striking
The majority purports to find a clear and unambiguous duty in Section 2, First. No other court has ever found such a freestanding duty in that Section. Instead, every court that has upheld a labor injunction under the auspices of the RLA has looked to the specific procedures and duties created by other sections of the RLA. Furthermore, the majority’s decision conflicts with the Supreme Court’s analysis of Section 2, First, which clarifies that Section 2 does not impose duties to engage in or refrain from acts not elaborated in other sections of the RLA.
As the majority concedes, the non-unionized Fuellers are not clearly subject to the dispute resolution procedures of the RLA. Maj. at 1116-18 (requiring the Fuellers to unionize in order to pursue dispute resolution under the RLA). Nor are they seeking to achieve ends envisioned in the RLA, such as selecting a bargaining representative or negotiating a collective bargaining agreement (CBA). Unable to locate a specific duty in the body of the RLA, the majority is thus compelled to base its holding on the broad aspirational language of Section 2, First. This holding creates a third justification for labor injunctions under the RLA that is both unprecedented and contrary to the Supreme Court’s understanding of Section 152, First.
In Virginian Railway, the Supreme Court observed that “the very words of [s]ection 2, First ... were taken from section 301 of the Transportation Act ..., [and] were held to be without legal sanction in that act.” Va. Ry. Co., 300 U.S. at 544-45, 57 S.Ct. 592 (citing Pa. R.R. Sys. & Allied Lines Fed’n v. Pa. R.R. Co., 267 U.S. 203, 215, 45 S.Ct. 307, 69 L.Ed. 574 (1925)). While holding that the RLA imposed obligations on unions and employers, the Court noted that “these words no longer stand alone and unaided by mandatory provisions of the statute as they did when first enacted,” because Section 2, Ninth of the RLA created mandatory obligations on employers to treat with unions. Id. Con- *1127 timing this theme, the Supreme Court held in 1943 that Section 2, First “merely states the policy which those other provisions [of the RLA] buttress with more particularized commands.” Gen. Comm. of Adjustment of Bhd. of Locomotive Eng’rs. for Mo.-Kan.-Tex. R.R. v. Mo.Kan.-Tex. R. Co., 320 U.S. 323, 334, 64 S.Ct. 146, 88 L.Ed. 76 (1943) (M-K-T). In other words, the Court held that Section 2, First is not a freestanding obligation, but rather a command that parties to a labor dispute undertake the specific grievance procedures detailed in the other portions of Section 2, and in the rest of the RLA.
The majority wholly relies on the Court’s subsequent holding that Section 2, First is “more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis.” Chi. & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 577, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). But the independent legal obligation the Court described in Chicago and North Western was not a new requirement, but rather a gloss on the duty, already recognized in M-K-T, to utilize the RLA’s procedures where applicable. Indeed, the Court explained that Section 2, First’s duty to “exert every reasonable effort” was essentially a requirement not to bargain in bad faith or to “go[ ] through the motions with a desire not to reach an agreement.” Chicago & N.W. Ry. Co., 402 U.S. at 578, 579 n. 11, 91 S.Ct. 1731.[10] The Court thus held that the duty in Section 2, First does not create new obligations, but instead allows courts to inquire into how diligently the respec-five parties have tried to satisfy their obligations under the other provisions' of the Act. See Bhd. of Maint. of Way Emps. v. Union Pac. R.R. Co., 358 F.3d 453, 457-58 (7th Cir.2004) (“The Supreme Court has considered Section 2, First analogous to the ‘duty under the National Labor Relations Act to bargain in good faith.’ ” (quoting Chi. &N.W. Ry. Co., 402 U.S. at 574-75, 91 S.Ct. 1731)). Chicago & North Western thus instructs courts to enforce the duty to bargain in good faith, as appropriate. It does not give courts license to invent new duties under that Section, as the majority does here.
The majority also ignores the fact that the Court in. Chicago & North Western instructed lower courts not to use That decision to enlarge the scope of Section 2, First. The Court explicitly cautioned that “great circumspection should be used in going beyond cases involving [a] desire not to reach an agreement, for doing so risks infringement of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements.” Chi. & N.W. Ry. Co., 402 U.S. at 579 n. 11, 91 S.Ct. 1731 (internal quotations omitted). The Court was also concerned that “the vagueness of the obligation under [Section] 2 First could provide a cover for judicial interference in labor relations of the sort that spawned the Norris-LaGuardia Act in the first place.” Id. at 583, 91 S.Ct. 1731.
Because the majority cannot find a specific duty in the dispute resolution procedures of the RLA upon which to rest its case, it improperly relies on the preambu-lar language in Section 2, First to create an unprecedented, nebulous new obligation requiring the Fuellers alone to take affir *1128 mative action to bring its disputes with the ASIG within the ambit of the RLA.
The majority cites a number of cases for the proposition that “section 2 First imposes an independent, mandatory duty enforceable by the courts.” Maj. at 1116. I do not dispute that Section 2, First creates a mandatory duty. This case instead concerns the scope of that duty. Indeed, the cases cited by the majority support reading Section 2, First as imposing a duty to bargain in good faith under the RLA when it applies rather than imposing a duty to unionize on unrepresented workers. See Reg’l Airline Pilots Ass’n v. Wings W. Airlines, Inc., 915 F.2d 1399, 1401 (9th Cir.1990) (“RAPA contends that the change in pass benefits after September 19 [when RAPA was certified as a bargaining representative] was a violation of section 2, First and Second because Wings West did not use the bargaining process and, in fact, distorted the bargaining process by a pre-bargaining reduction in benefits.”); Delta Air Lines, Inc. v. Air Line Pilots Ass’n, Int’l, 238 F.3d 1300, 1309 (11th Cir.2001) (finding that Section 2, First imposed a duty on a union to prevent its members from “collectively disrupting] Delta’s flight operations, in contravention of the CBA ..., by way of a no-overtime campaign”); Int’l Ass’n of Machinists & Aerospace Workers, AFL-CIO v. Trans World Airlines, Inc., 839 F.2d 809, 812-14 (D.C.Cir.1988) (holding that Section 2, First imposed a duty on management not to unilaterally change working conditions pending negotiation of a CBA with a newly certified union).
B. The Majority Opinion Fundamentally Disturbs the Balance of Interests Contemplated by the RLA
Section 2, First states that all carriers and employees have a duty to “exert every reasonable effort to make and maintain agreements ... and to settle all disputes whether arising out of the application of such agreements or otherwise.... ” 45 U.S.C. § 152, First. The majority concludes that this means that the Fuellers have an obligation to unionize and bargain collectively. This reading of Section 2, First clashes with the plain language of the RLA, which gives employees the “right to organize and bargain collectively through representatives of their own choosing.” 45 U.S.C. § 152, Fourth. Whereas the RLA simply grants employees a right to organize, the majority imposes an obligation on the employees to seek unwanted representation.
Furthermore, the majority’s distorted reading of Section 2, First undermines the compromise between labor and management inherent in the RLA itself. The majority holds that the Fuellers may strike only after they have appointed a representative and attempted to negotiate a CBA. Maj. at 1118-19. The National Mediation Board (NMB), however, concluded that the Fuellers were not a “class or craft” capable of appointing a representative. See NMB Letter at ECF No. 14.1 (declining to mediate the dispute between the Fuellers and ASIG). The majority thus imposes an impossible burden on the Fuellers: The Fuellers must organize before they can engage in self help, but the Fuellers cannot organize.[11] This result *1129 cannot be squared with the deal struck by the drafters of the RLA, in which employees forfeited their right to strike at will in return for the promise that employers would negotiate with their designated representatives in good faith.
Here, the Fuellers have made strenuous efforts to resolve their differences with ASIG concerning the safety of their working conditions, and the allegedly retaliatory suspension of Mr. Popescu, including: asking ASIG to explain its investigation into and suspension of Mr. Popescu; reaching out to ASIG’s Human Resource Department; and asking the NMB to mediate their dispute. In contrast, ASIG has steadfastly refused to even speak with the Fuellers, either individually, or as a group. By foreclosing the ability of the Fuellers to negotiate, the majority’s decision leaves them with only two options: they must either acquiesce to what they view as unsafe working conditions and vindictive management behavior, or they must quit.
In essence, the majority opinion relies on the following syllogism:
• Major Premise: Section 2, First requires that employees attempt to settle disputes through RLA procedures.
• Minor Premise: Although the Fuellers are not presently subject to those procedures because they seek neither a representative nor a CBA, the employees could take advantage of the RLA by appointing a representative and seeking a CBA.
• Conclusion: Because the Fuellers could take advantage of the RLA by taking certain voluntary predicate acts, namely unionizing, Section 2, First imposes a duty on the Fuellers to take those predicate acts so that, they can avail themselves of the RLA.
Requiring parties to take affirmative actions in order to bring themselves within the RLA’s dispute resolution procedures will, among other things, dramatically alter the manner in which unions in industries covered by the RLA gain recognition, as is evident in this very case.[12] Because both employers and employees are bound by the same language in Section 2, First, the majority’s logic must apply equally to both. 45 U.S.C. § 152, First. ASIG refuses to negotiate with the Fuellers because they are not a duly certified union. However, while employers are not obligated to negotiate with representatives that are not certified by the NMB, they may choose to do so. See Summit, 628 F.2d at 795. Thus employers, just like employees, can opt to bring disputes within the ambit of the RLA through voluntary predicate actions, namely by recognizing a representative that has not been certified by the NMB. The logic of the majority opinion then would, apparently, not only require that the Fuellers attempt to appoint a representative, it would also require ASIG to voluntarily recognize any resulting representative in order to begin negotiating a CBA. Obviously, such a rule would dramatically alter the NMB’s role in certifying union elections. See 45 U.S.C. § 152, Ninth.
*1130 III. The Injunction Must Be Vacated Because ASIG has not Complied with Section 8 of the NLGA.
Even if the majority’s one-sided construction of the RLA could be justified, the injunction must still be vacated because ASIG failed to comply with the requirements of Section 8 of the NLGA before seeking that injunction. In order to obtain a labor injunction, a complainant must not only seek to enjoin behavior that falls within an exception to the NLGA, it must meet the statutory requirements set out in that Act. 29 U.S.C. § 101 (“No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter....”). Section 8 of the NLGA states that “[n]o restraining order or injunctive relief shall be granted to any complainant who has failed ... to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.” 29 U.S.C. § 108. This principle applies even where the injunction is aimed at enforcing compliance with a specific duty of the RLA. See Grand Trunk W. R.R., Inc. v. Bhd. of Maint. of Way, 497 F.3d 568, 571 (6th Cir.2007) (analyzing whether employer had complied with Section 8 where the injunction sought to enforce provisions of the RLA). In order to comply with Section 8, a complainant “must also go beyond [its legal obligations] and make all reasonable effort, at the least by the methods specified if they are available, though none may involve complying with any legal duty.” Bhd. Of R.R. Trainmen Enter. Lodge, No. 27 v. Toledo P. & W. R.R., 321 U.S. 50, 57, 64 S.Ct. 413, 88 L.Ed. 534 (1944).
The majority holds that because the Fuellers “have not carried their duty under the RLA, ASIG has shirked none of its duties.” Maj. at 1121. In other words, the majority contends that because the Fuellers have not sought a representative, ASIG does not have a legal obligation to negotiate. Id. Section 8, however, requires ASIG to take steps to resolve a dispute even if it is not legally required to do so, prior to even seeking an injunction. See Bhd. Of R.R. Trainmen Enter. Lodge, No. 27, 321 U.S. at 57, 64 S.Ct. 413; Carter v. Herrin Motor Freight Lines, 131 F.2d 557, 561 (5th Cir.1942) (“[The NLGA] denies the equitable relief of injunction to one, who, as plaintiff did here, standing upon his legal rights, fails to use every reasonable effort by negotiation, mediation or arbitration to find a common ground for composing and settling a labor dispute.”). Interestingly, this language mirrors the language that the majority finds so persuasive in Section 2, First of the RLA. 45 U.S.C. § 152, First. Surely if “every reasonable effort” requires the Fuellers to seek a representative before they can strike, the same language in the NLGA requires ASIG to at least make some effort to resolve the dispute before seeking the drastic remedy of a labor injunction. Accordingly, ASIG has not fulfilled its obligations under Section 8 of the NLGA, the district court did not have jurisdiction to issue the injunction in this case, and the injunction issued by the district court should be vacated.
Conclusion
The majority reads the ambiguous language of Section 2, First too broadly, while at the same time inappropriately reading the language of NLGA Section 8 out of existence. Because the Fuellers have violated no express provision of the RLA, and ASIG failed to satisfy the condition precedent in Section 8 of the NLGA before *1131 seeking an injunction, the district court had no jurisdiction to issue that injunction, and it should be vacated.
I respectfully dissent.

. Because I believe that the injunction must be vacated for the reasons set forth below, I express no opinion with respect to the First Amendment analysis in the majority opinion.

. Section 2, First reads: "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152, First.

. The Clayton Act states: "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment. ...” 29 U.S.C. § 52. The Supreme Court noted over 70 years later that “[tjhe language of the Clayton Act was broad enough to encompass all peaceful strike activity.” Burlington N. R.R. Co., 481 U.S. at 438, 107 S.Ct. 1841.

. “No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.” 29 U.S.C. § 101.

.I, of course, do not suggest that my colleagues in the majority bear any resemblance to the judges criticized in connection with the passage of the NLGA. Even though I disagree with their analysis, I acknowledge that my colleagues hold their views in good faith, and that they are construing the law as they understand it.

. Unions had gained increased prominence while the railroads were under federal control due to World War I. See Chris Hollinger, The Railway Labor Act, ABA Section of Labor and Employment, 49 (2012). Due in part to unions’ increased prominence, by the time the federal government returned the railways to private control in 1920 "about 90% of the train and engine service employees were organized and about three-quarters of those in the other classes.” Lloyd K. Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L.J. 567, 570 (1937).

. The RLA was extended to cover the airline industry in 1936. RLA § 201; 45 U.S.C. § 181.

. See, e.g., Burlington N. R.R. Co., 481 U.S. at 444, 107 S.Ct. 1841 (declining to uphold a strike injunction because "[t]he RLA's silence could just as easily signify an intent to allow the parties to resort to whatever self-help is legally available at the time a dispute arises"); Va. Ry. Co. v. Sys. Fed’n No. 40, 300 U.S. 515, 549, 57 S.Ct. 592, 81 L.Ed. 789 (1937) (holding that an employer could be enjoined for failing to "treat” with an elected representative as required by Section 2, Ninth of the RLA); Burlington N. Santa Fe Ry. Co., 203 F.3d at 713 (holding that courts can issue strike injunctions where "the [RLA] provides the procedure for resolving the dispute”).

. See, e.g., Bhd. Of Locomotive Eng’rs v. Louisville & Nashville R.R. Co., 373 U.S. 33, 41-42, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963) (holding *1126 that permitting strikes aimed at enforcing arbitration awards stemming from minor disputes would render “meaningless” the RLA provisions that call for judicial enforcement of such awards); Chi. R. & I.R. Co., 353 U.S. at 34, 77 S.Ct. 635 (holding that employees could not strike to protest minor disputes, because allowing employees to do so would render the RLA's procedures for addressing minor disputes, which call for arbitration, meaningless); Summit Airlines, Inc. v. Teamsters Local Union Number 295, 628 F.2d 787 (2d Cir.1980) (holding that allowing employees to force recognition of a union by striking would undermine provisions of the RLA concerning representation disputes).

. The dissent framed the question presented in Chicago and North Western as; "to what extent a District Court may inquire into collective negotiations in determining whether a party has complied with its statutory duty.” Chicago & N.W. Ry. Co., 402 U.S. at 588, 91 S.Ct. 1731 (Brennan, J., dissenting).

. The NMB has determined that ASIG Fleet Services Employees, which includes the Fuel-lers, constitute a nationwide system. See 40 NMB No. 13 at 49. Accordingly, the Fuellers can only unionize by obtaining the votes of 50% of ASIG’s national employees. Id. at 48-49. The majority is thus incorrect that the Fuellers, who constitute only the service employees at Sea-Tac, can organize to protect their interests. Even if every member of the Fuellers seeks a representative they would not be entitled to recognition without a national *1129 election. Id. The majority’s decision thus imposes burdens under the RLA on a group of workers, the Fuellers, who lack any recourse to the protections of the RLA, which are predicated on the existence of a certified representative.

. Presently, employers áre only obligated to negotiate with representative that have been elected by 50% of the “craft or class” attempting to unionize pursuant to the RLA. See 45 U.S.C. §§ 152, Third, Fourth, Ninth. The NMB has determined that ASIG Fleet Services Employees, which includes the Fuellers, constitute a nationwide system. See 40 NMB No. 13 at 49.